UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| CHNJ INVESTORS, LLC,<br><br>　　　Plaintiff,<br><br>　　　　　v.<br><br>ROGER KOGER, et al.,<br><br>Defendants. | Civil No. 12-1467 (RMB/KMW)<br><br>**OPINION** |

**APPEARANCES:**

LisaAnne R. Bicocchi, Esquire
Michael S. Horn, Esquire
Patrick Papalia, Esquire
Archer & Greiner, P.C.
Court Plaza South, West Wing
21 Main Street, Suite353
Hackensack, New Jersey 07601-7095

　　Attorneys for Plaintiff

Robert T. Koger
82940-083
Hope Village RRC
2840 Langston Place SE
Washington, Dc 20020

　　Defendant

**BUMB,** UNITED STATES DISTRICT JUDGE:

　　Plaintiff, CHNJ Investors, LLC, is a limited liability company.  See Declaration of Ved Parkash, dated December 2, 2015 [Docket No. 101] ("Parkash Dec.") ¶2.  Defendant Robert T. Koger was the sole shareholder, President and Secretary of Defendant

Molinaro/Koger, Inc., and "was responsible for business development" from 1994 to July 2011. PUF, at 2. ("PUF" refers to Plaintiff's Statement of Undisputed Material Facts [Docket Ent. No. 131-2].) The parties do not dispute that Molinaro was "an international hotel real estate brokerage and advisory firm" that "specializ[ed] in hotel transactions." PUF, at 3.

In 2010, CHNJ claims that it consulted Koger to act as broker in the purchase of a loan secured primarily by real and personal property and improvements in Cherry Hill, New Jersey ("the Loan") that was in foreclosure. PUF, at 1. The Loan was held by MTGLQ Investors, LP c/o Archon Group L.P. ("MTGLQ"), which was seeking to sell it. PUF, at 1.

Defendant denies that he acted as a broker or advisor, see Defendant's Response to PUF ("DR"), Docket No. 144, at 1. According to Koger, the owner of the property, P & P Hospitality, LLC ("P&P") had defaulted on the Loan and was contesting the foreclosure. DUF, at 1. ("DUF" refers to Defendant's Statement of Facts, Docket No. 144, at 8). Koger avers, in relevant part, that an attorney, Mark Morris, who was representing P&P, explained to Koger "that the tactics P&P were employing to delay the foreclosure process had negatively impacted the relationship between the borrower and the lender. Morris explained that a group of the principals wanted to purchase the Loan but that the lender would not sell the Loan to

2

them due to the 'bad blood' between the groups." *Id.* at 7-8. Morris had contacted Koger to determine if he could assist by acquiring the Loan and then selling it to Ved Parkesh and Fajni Patel, principals of P&P. DUF, at 3. According to Koger, he had had a long-standing relationship with Patel, insinuating that is why Morris approached him. DUF, at 6. Koger further contends that since he was friends with Patel he agreed to act as an acquirer of the Loan, and Patel agreed to pay for all Koger's attorney's fees. Defendant Purcell, LLC ("Purcell") was formed to acquire the Loan and sell it to Patel and Parkesh who formed CHNJ to acquire the Loan. DUF, at 7.

Thereafter, or about November 12, 2010, CHNJ's principal signed what Plaintiff characterizes as a Retainer Letter (the "Retainer") with Koger for the express interest of CHNJ acquiring the Loan. PUF, at 5. The Retainer stated, among other things, that "the Buyer and the Seller shall enter into discussions and if mutually agreeable enter into a Purchase and Sale Agreement ("P&S")," the "Seller shall prepare the initial draft of the P&S," and the "Buyer will place a refundable deposit of One Million dollars ($1,000,000.00) in escrow with Molinaro Koger." *Id.* It provided the retainer would terminate unless it was accepted by the Seller, which it was when CHNJ signed it and paid the initial $1,000,000 deposit. *Id.*

Defendant contends that the Retainer was a "Letter of Intent," not a retainer agreement, DR at 5, DUF, at 9. Koger further avers that the "Letter of Intent" was signed by Parkesh under an entity named SP NY, LLC, a company owned by Koger, but he did not authorize the signature.

CHNJ contends that in reality, unbeknownst to it, Koger entered into the Retainer to defraud CHNJ as he had no intention of closing a legitimate deal. Parkash Dec. ¶6. Soon after the Retainer was signed, Koger's misrepresentations and omissions began. *Id.* First, CHNJ avers Koger falsely told CHNJ that because of the foreclosure MTGLQ would not sell the Loan to CHNJ or its principals, would not negotiate directly or indirectly with CHNJ for the Loan, and the only way to effectuate the sale would be a simultaneous closing with MTGLQ selling the Loan to a straw man which would in turn sell the Loan over to CHNJ. Parkash Dec. ¶7. CHNJ agreed with Koger to have him set up a straw man company to acquire the Loan from MTGLQ and sell it over to CHNJ, and Koger thereafter represented to CHNJ that he had created Purcell with himself as a member for that purpose. PUF, at 10. Indeed, Koger stated in his answers to Interrogatories:

> "The only business Purcell was engaged in was to purchase the Loan on behalf of CHNJ"; "I was a member of Purcell. Purcell was formed to acquire the Loan. There was no other business that Purcell was engaged in. There was no income generated by Purcell"; "My

> role was in capacity as member of Purcell whereby
> Purcell negotiated a contract with Archon [MTGLQ] and
> Purcell negotiated a back to back contract with CHNJ";
> and "They asked whether I would form a company and act
> as a straw buyer and flip them the Loan."

Declaration of LisaAnne R. Bicocchi, Esq., dated December 21, 2016 ("Bicocchi Dec.") ¶8, Ex. E Nos. 1-2, 10; PUF, at 6-7. In reality, CHNJ contends, Koger controlled Purcell for no legitimate purpose and used it merely to commit fraud. PUF, at 8. The supposed "representatives" of Purcell who executed documents on behalf of Purcell and the resulting documents were all phony. See PUF, at 11, PUF, at 23.

In stark contrast, Defendant admits to owning and controlling Purcell, DR at 6, but states that Plaintiff knew precisely why Purcell was set up – and although he claims that the terms "straw buyer" and "flip" are "ambiguous," DR at 6, Koger contends that he was conducting the transaction as Plaintiff had intended it. DUF, at 9-10.

Thereafter, pursuant to the so-called Retainer, CHNJ executed a series of documents Koger falsely represented were genuine, necessary, and relevant to Purcell obtaining the Loan from MTGLQ and selling it over to CHNJ, and CHNJ released a substantial amount of money from escrow, all of which was lost. PUF, at 14, 17, 19-22, 35-36, 40, 42-46, 48, 50, 68.

CHNJ avers that Koger falsely told CHNJ that Purcell entered into a Confidentiality Agreement with MTGLQ that

5

prohibited Purcell from communicating with CHNJ about the Loan as a condition precedent to negotiations with MTGLQ, and he provided CHNJ with a bogus Confidentiality Agreement indicating it was signed by "Terry Lloyd" of "Purcell Investments" on January 20, 2011. PUF, at 11. Koger, however, concealed from CHNJ that Terry Lloyd was an employee of Koger's who died in February 2010. *Id.*

Defendant denies that the Confidentiality Agreement was bogus only because the term "bogus" is unambiguous. DR, at 11. Moreover, Kroger does not deny that David Miller's signature was a forgery and the document was a fake, instead contending that the person Miller is "of no legal significance." DR, at 12. This is so, Koger avers, because CHNJ was well aware of what he was doing, and his conduct was done at the behest of Morris. To state it differently, "Plaintiff knew and understood at all times it was dealing with Koger." *Id*.

CHNJ avers that Koger led it to believe that two sets of Purchase and Sale Agreements and amendments were necessary as part of the transaction: "back end" ones between CHNJ and Purcell and "front end" counterparts between Purcell and MTGLQ. Parkash Dec. ¶12. All of these documents that Koger presented to CHNJ were fraudulent too, CHNJ argues, which CHNJ did not know at the time. *Id.* They bore the signature of a David Miller of Purcell, but there was no David Miller ever associated with

Purcell. PUF, at 23. Again, Koger does not deny this. Indeed, CHNJ points to evidence where Koger gave sworn deposition testimony in another action that he did not know anyone at all named David Miller. *Id.* He testified that no David Miller was an officer or member of Purcell, and no David Miller ever had any association with Molinaro. *Id.* The signatures were fake. In response, Koger asserts in his opposition that he "had authority to bind Purcell and by signing a name, any name, this expressed Defendant's intent." [Docket No. 144, pg. 32]. See also DR, at 14. It was irrelevant, Koger avers because CHNJ knew that it was dealing with Koger. DR, at 12.

As CHNJ presents, Koger presented CHNJ with a fraudulent "front end" Purchase and Sale Agreement, dated April 27, 2011 (the "front end PSA") that he represented was entered into between MTGLQ and Purcell to purchase the Loan for $15,500,000. PUF, at 12. It indicates that the "Buyer's Notice Person" is "David Miller" and is signed by "David Miller," a "member" of Purcell. *Id.* Again, as CHNJ has provided evidence of – and Koger has not disputed beyond bold allegations -, Koger withheld from CHNJ that there was no David Miller affiliated with Purcell, Koger, or Molinaro; the signature was a forgery; and the document was a fake. *Id.* As such, CHNJG contends, Koger misled CHNJ that the $15,500,000 stated in the front-end PSA was the best possible price at which the Loan could be acquired from

7

MTGLQ, when in fact MTGLQ was willing to sell the Loan to Purcell for $12,500,000. Parkash Dec. ¶14. Again, Koger replies that this was the intent of the parties. DR, at 14.

Similarly, CHNJ produces evidence that at about the same time Koger provided CHNJ with the front end PSA, he provided CHNJ with a fraudulent "back end" Purchase and Sale Agreement, dated April 27, 2011 (the "back end PSA"), that he induced CHNJ to sign by falsely presenting it to CHNJ as a valid agreement for CHNJ to purchase the Loan from Purcell for $15,500,000 after Purcell obtained the Loan from MTGLQ pursuant to the front end PSA. PUF, at 14. The back-end PSA indicates that the "Seller's Notice Person" is "David Miller" and bears a signature of "David Miller" as "member" of Purcell. *Id*. Believing everything to be legitimate, CHNJ executed the back-end PSA and CHNJ's initial $1,000,000 deposit was placed in escrow. PUF, at 17. Again, Defendant does not dispute that Miller was a fake signature but contends that he, in essence, was carrying out the intent of Plaintiff.

Thereafter, on or about May 19, 2011, Koger presented CHNJ with a fraudulent front end First Amendment to the PSA and a fraudulent corollary back end First Amendment to the PSA, both of which bore a signature by "David Miller" and indicated his title was "V.P." of Purcell. PUF, at 19. The front end First Amendment stated that the $1,000,000 CHNJ had deposited to

8

escrow was to be released by MTGLQ and would be a credit to the $15,500,000 purchase price, leaving a $14,500,000 balance to be paid at closing, and the bogus back end First Amendment provided that CHNJ consented to Purcell, the "Seller," authorizing release of the $1,000,000 deposit that was being held in escrow and the deposit being a credit to the purchase price of the Loan leaving a $14,500,000 balance due at closing. *Id.* The back end First Amendment also provided CHNJ could purchase extensions of the closing date for $25,000 per week, increased the Seller's Fee to be paid to Purcell, and directed that the sum of $25,000 be paid to counsel for Purcell. *Id.*

CHNJ avers that it relied on Koger's representations and believing the documents and the deal to be legitimate, CHNJ executed the back end First Amendment, paid an "Additional Deposit" of $1,000,000 into escrow believing it would be applied as partial payment of the purchase price of the Loan as the back end PSA falsely represented it would be, and authorized release of $1,025,000 from escrow to MTGLQ. PUF, at 20. CHNJ thereafter authorized a series of five more disbursements of $25,000 each to be released from escrow to MTGLQ over the next five weeks for additional weekly extensions. *Id.* In total, CHNJ authorized $1,150,000 to be disbursed from escrow to MTGLQ, all of which was forfeited to MTGLQ when the deal failed to close as a result of Koger's fraud. PUF, at 20, 43.

During due diligence, CHNJ came to believe that $15,500,000 was not the lowest price at which Purcell could purchase the Loan from MTGLQ and that Koger intended to divert the $3,000,000 premium that would have been paid by CHNJ to himself. Parkash Dec. ¶18. When CHNJ learned this, the purchase price was adjusted to $12,500,000, and CHNJ agreed to pay Koger a fee of $500,000. *Id.* But Koger continued to conceal from CHNJ his overall fraud and lack of intent to ever close the sale of the Loan. *Id.* Unaware of the fraud, CHNJ relied on the purchase price adjustment and Koger's agreement to accept a $500,000 fee and continued to move forward with what CHNJ believed was a valid deal for Purcell to purchase the Loan from MTGLQ and sell it to CHNJ. *Id.*

On or about June 24, 2011, Koger presented CHNJ with a fraudulent back end Second Amendment to the PSA between Purcell and CHNJ that bore a bogus signature by "David Miller" as "member" of Purcell. PUF, at 21. Unaware this too was fake, CHNJ executed the back end Second Amendment, which indicated the amended price for the Loan was $12,500,000, provided an additional $825,000 was to be released from escrow to Purcell, and contained a false acknowledgement that upon payment of the $825,000, Purcell "will have the sum of $1,825,000.00 on account of the Purchase Price, leaving a balance due at Closing of Ten Million Six Hundred Seventy-Five Thousand Dollars

10

($10,675,000.00)." *Id.* This was false because Purcell was not holding $1,825,000 "on account of the Purchase Price" of the Loan and was never going to pay the $825,000 over to MTGLQ to reduce the balance due or close a deal with MTGLQ and CHNJ. *Id.* In reliance on Koger's representations and unaware of the fraud, CHNJ authorized release from escrow of $825,000 to Purcell and $25,000 to Purcell's attorney. *Id.* ¶20.

On or about July 1, 2011, Koger presented CHNJ with what CHNJ contends was fraudulent front and back end Third Amendments to the PSA, which both bore signatures by "David Miller" as "member" of Purcell. PUF, at 22. The front end Third Amendment falsely stated that a total of $1,825,000 in deposit moneys had been released to MTGLQ and would be credited against the Purchase Price at closing. *Id.* CHNJ states that I was not aware that Koger had already diverted the $825,000 it released from escrow to Purcell to HEI Hospitality Fund III, LP, a company Koger owned, and to Koger's wife in June 2011. *Id.* The back end Third Amendment falsely stated that a total of $1,825,000 in deposit moneys had been released to Purcell and would "be credited against Purchase Price at Closing." *Id.* Because Koger failed to tell CHNJ the true facts, including that he had diverted the $825,000 from Purcell and $1,825,000 would not be credited to the Purchase Price at Closing, CHNJ executed the Third Amendment. *Id.*

11

Unaware of the fraud and in reliance on Koger's representations and the false documents he presented, CHNJ contends that it lost a total of $2,000,000. In addition to the $2,000,000, CHNJ also provided Koger a $150,000 loan based on his representation that he would repay it. Koger has defrauded CHNJ out of this $150,000 because he did not repay the loan and never intended to. *Id*.

As to the $150,000 loan, Defendant simply responds that CHNJ's "statement is speculative and conclusory." DR, at 49. Importantly, he does not deny it. As to the $2,000,000, Defendant lays out that the PSAs, including amendments, were enforceable in that CHNJ had legal counsel and that CHNJ understood at all times they were dealing with Koger who had authority to bind Purcell, in order to accomplish CHNJ's objective.

On September 4, 2013, the United States filed a criminal complaint against Koger, charging him with conspiracy to commit wire fraud and wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1349 in connection with a scheme to defraud and to obtain money and property by false pretenses, representations, and promises, that was conducted by several persons, including Koger and Jonathan Propp ("Propp"), the Chief Operating Officer of Molinaro, in connection with Molinaro. PUF, at 63. On January 16, 2014, Koger entered a plea of guilty to

wire fraud in violation of 18 U.S.C. §1343 and conspiracy to commit wire fraud in violation of 18 U.S.C. §1349. *Id.* In connection with the plea agreement, Koger stipulated to a Statement of Facts, dated February 16, 2014 ("Koger's Statement of Facts"). *Id.*

Koger stipulates in his Statement of Facts that he committed wire fraud and conspiracy to commit wire fraud by "execut[ing] a series of illegal 'flips' of hotels." PUF, at 64. Koger stipulates that he executed these illegal flips by convincing his clients to sell their properties to straw buyers that Koger created and controlled using simultaneous front-end and back-end transactions and diverted the funds received by the straw buyers for his own benefit. *Id.* He assumed identities of other persons to pose as the owners of the straw buyers. *Id.* Koger stipulates that Lloyd was an employee of Koger's whose name Koger used to sign documents on behalf of straw man intermediaries in fraudulent deals notwithstanding Lloyd died in February 2010. *Id.* Importantly, however, the Stipulated Facts do not specifically address the CHNJ transaction here.

**LEGAL ANALYSIS**

<u>Summary Judgment</u>

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

13

Civ. P. 56(a).  A fact is "material" only if it might impact the "outcome of the suit under the governing law." Gonzalez v. Sec'y of Dept of Homeland Sec., 678 F.3d 254, 261 (3d Cir. 2012).  A dispute is "genuine" if the evidence would allow a reasonable jury to find for the nonmoving party. Id.

In determining the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all reasonable inferences and doubts should be resolved in favor of the nonmoving party. Melrose, Inc. v. City of Pittsburgh, 613 F.3d 380, 387 (3d Cir. 2010).  However, a mere "scintilla of evidence," without more, will not give rise to a genuine dispute for trial. Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).  Moreover, a court need not adopt the version of facts asserted by the nonmoving party if those facts are "utterly discredited by the record [so] that no reasonable jury" could believe them. Scott v. Harris, 550 U.S. 372, 380 (2007).  In the face of such evidence, summary judgment is still appropriate "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Walsh v. Krantz, 386 F.App'x 334, 338 (3d Cir. 2010).

The movant has the initial burden of showing through the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits "that the non-movant has failed to establish one or more essential elements of its case."

Connection Training Servs. v. City of Phila., 358 F. App'x 315, 318 (3d Cir. 2009). "If the moving party meets its burden, the burden then shifts to the non-movant to establish that summary judgment is inappropriate." Id. In the face of a properly supported motion for summary judgment, the nonmovant's burden is rigorous: he "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995); accord. Jackson v. Danberg, 594 F.3d 210, 227 (3d Cir. 2010) (citing Acumed LLC. v. Advanced Surgical Servs., Inc., 561 F.3d 199, 228 (3d Cir. 2009) ("[S]peculation and conjecture may not defeat summary judgment."). Moreover, "the court need only determine if the nonmoving party can produce admissible evidence regarding a disputed issue of material fact at trial"; the evidence does not need to be in admissible form at the time of summary judgment. FOP v. City of Camden, 842 F.3d 231, 238 (3d Cir. 2016).

    A. Counts One, Two, Four, Six, Seven, Eight and Nine

The evidence presented shows there is a genuine issue of material fact as to the necessary elements of each of these causes of action, i.e. the intent of the parties. CHNJ's submission sets forth several instances of fraud, yet Koger has

15

disputed the instances by claiming, under penalty of perjury, that he was only acting consistent with the parties' intent. Accordingly, because it cannot be said that the undisputed evidence establishes that there is no genuine issue of material fact that Koger committed fraud and/or malpractice against CHNJ, summary judgment as to these Counts will be denied without prejudice.[1]

   A. Count Three – Unjust Enrichment

Unjust enrichment action "rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another, and on the principle of whatsoever it is certain a man ought to do, that the law supposes him to have promised to do." Bergen County Sewer Authority v. Borough of Bergenfield, 142 N.J. Super. 438, 455 (Law Div. 1976). The undisputed evidence which Defendant has not genuinely disputed, demonstrated that Defendant did not do what he promised to do for CHNJ, and he enriched himself unjustly at CHNJ's expense. Defendant does not deny he received the Loan. Nor does he deny

---

[1] The Court is well aware that Defendant Koger has admitted to criminal conduct related to the type of conduct at issue in this case. Koger, however, has disputed material facts under penalty of perjury. A person who makes false statements before this Court is subject to criminal penalties, see 18 U.S.C. §§ 1621-23; United States v. Gross, 511 F.2d 910, 914-15 (3d Cir. 1975) (holding that making a false declarations to a tribunal is "a species of perjury" and may be criminally punishable as such).

that he did not repay the Loan. Accordingly, summary judgment as to CHNJ is granted on its Third Count for unjust enrichment.

**CONCLUSION**

Accordingly, for the above reasons, Summary Judgment is Denied Without Prejudice as to Counts One, Two, Four, Six, Seven, Eight and Nine, and Summary Judgment is Granted as to Count Three.

s/Renée Marie Bumb  
RENÉE MARIE BUMB  
UNITED STATES DISTRICT JUDGE

Date: September 25, 2019